**CONFEDERATION OF POLICE et al.,**
**Plaintiffs,**

v.

**CITY OF CHICAGO, a municipal corporation, et al., Defendants.**

**No. 71 C 3005.**

United States District Court,
N. D. Illinois, E. D.

Oct. 7, 1974.

---

44. *See*, Jones v. D. C. Redevelopment Land Agency, 499 F.2d 502 (D.C.Cir.1974).

Gilbert Cornfield, Chicago, Ill., for plaintiffs.

Richard L. Curry, Corp. Counsel, Michael Small, Asst. Corp. Counsel, Robert J. Downey, Frank Sewelski, Robert Petki, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

This matter was tried to the Court without a jury. For the reasons set forth below, judgment for the defendants will be entered and the amended complaint will be dismissed. This opinion shall constitute the Court's Findings of Fact and Conclusions of Law as provided by Fed. R.Civ.P. 52(a).

This is an action [1] for declaratory and injunctive relief. Jurisdiction is based on the First and Fourteenth Amendments to the United States Constitution, 28 U.S. C. § 1331, and 42 U.S.C. § 1983. The Court has jurisdiction of the parties and of the subject matter, and venue is appropriate.

The plaintiffs, the Confederation of Police (COP) [2] and several of its officers, allege that the City of Chicago [3] and its Mayor, Richard J. Daley (Daley) and the Superintendent of Police [4] have denied the patrolmen of the City of Chicago their constitutional rights to an effective means to redress their grievances in connection with their employment by failing to establish and promulgate a grievance procedure and a form of collective bargaining for patrolmen within the Police Department. Plaintiffs further allege that certain of the defendants have discriminated against the policemen by maintaining a procedure for collective bargaining with labor organizations representing employees of the City of Chicago as regards hours, wages and working conditions, and refusing to maintain the same with sworn personnel of the Chicago Police Department who are members of COP, thereby denying plaintiffs the equal protection of the laws.

Several basic facts are not in dispute. COP has continually sought a uniform and objective procedure by which the sworn personnel of the Police Department may seek redress of grievances in connection with their hours, wages and working conditions [5] through representa-

---

1. The original complaint, filed on December 17, 1971, had two counts. Count 1, which sought a union dues check off system, was voluntarily dismissed by the plaintiffs after the Police Department agreed to implement that system. An amended complaint was then filed.

2. COP is an employee organization consisting of the majority of the sworn members of the Chicago Police Department in the patrolman classification. Of the approximately 6200 paying members of COP, approximately 6000 are patrolmen. There are approximately 10,-000 active patrolmen in the Chicago Police Department. The president of COP is James Johnson (Johnson).

3. The City of Chicago is a municipality chartered by the State of Illinois, and a local governmental agency within the meaning of Ill. Rev.Stat. ch. 85, § 472.

4. The Superintendent at the time this suit was filed was James Conlisk. The parties have, by agreement, substituted the current Superintendent, James Rochford.

5. The types of grievances include matters such as section or geographical transfers, changes in shift (watch) assignments, hours of work and wages. In addition, plaintiffs testified to instances in which patrolmen have been effectively demoted (reassigned) from positions as detectives, youth officers, and radio dispatchers without any notice of the reasons, or knowledge of recourse to any written and promulgated appeal or grievance procedure. The same fact was established for some instances in which patrolmen were passed over for promotion to the same positions, without explanation. It should be noted that although the detective, youth officers, and radio dispatch positions pay about $1,000.00 per year more than other patrolmen, the selection and demotion from the positions is a function of the Superintendent's office without any form of involvement of the Civil Service Commission. Plaintiffs also protest the fact that they cannot comment upon their efficiency ratings.

Police Department Notice No. 74-10 sets out in detail, however, the procedures to be

tives of their own choosing. This has been denied to them. There has been no formal[6] system or procedure by which sworn personnel of the Chicago Police Department may seek redress of grievances in connection with their hours, wages and working conditions, except in cases of discharges or suspensions in excess of thirty (30) days, which are referred by statute to the Police Board of the City of Chicago.[7] Additionally, the City of Chicago has maintained a practice whereby it pays the prevailing rate which craft union members are paid in the private sector.[8]

Plaintiffs presented only two instances in which the defendants have allegedly granted collective bargaining rights to municipal employees. The first concerns the non-academic employees of the Chicago Board of Education (Board). It is undisputed that these employees have these rights. It should be noted, however, that the Board is a separate corporate entity, distinct from the City of Chicago, and has its own management and budget. See Ill.Rev. Stat. ch. 122, §§ 34–2, 34–16, 34–17. The fact that the Mayor appoints Board members does not make it an agent of the City, since after their appointment they are independent officers. Also, the fact that the Civil Service Commission administers examinations does not involve the City, since the Commission does not establish the job qualifications or categories, but merely provides an objective testing and grading system. Thus, this evidence is not sufficient to show that the defendants have acted in a discriminatory manner.

The only other evidence submitted in regard to the establishment of a uniform and objective procedure for grievances for other city workers was the testimony of Thomas Beagley, that a grievance procedure was negotiated with Mr. Ralph Newman, President of the Library Board, and other members of the Board, with the Library workers and their union representatives from about March 13, 1967 to December 11 and 12 of 1967, when the procedure was formalized. There was no testimony that the Mayor or the City Council established the grievance procedure for the library workers and Board. In fact, Beagley testified "that as best I can recall, the Mayor asked if there wasn't some way that we could resolve the differences between the union and the library which at that time were rather serious." Beagley then testified that the Mayor made a phone call and suggested that he (Beagley) go over to the library and see two library officers and attempt to reach an agreement. He later testified that his discussions with the Mayor went to the point of the union's right to represent members of the union who were em-

followed by superiors in rating their subordinates against the objective criteria of quality of work, quantity of work, attendance and promptness, dependability, and indicating what items should be considered under these categories. It cautions that the rater evaluate each member according to the same set of fair and impartial standards and that the ratings should be used by a superior to inform the subordinate of the areas where improvement is needed and to counsel him how to attain an improved level of performance.

In matters of initial placement and promotion, the Civil Service Commission administers examinations; however, it does not determine job qualifications or specifications. That is left to the Police Department and Police Board.

6. There does exist an informal grievance procedure, common to most occupations, which basically involves complaints to one's superiors. This is not a written procedure. Also, prior to submissions of the proposed budget to the City Council, plaintiffs and other police organizations meet with the Mayor and have the opportunity to present their demands, as do the organizational representatives of other City employees.

7. Ill.Rev.Stat. ch. 24, § 10–1–18.1 (1974) provides a formal procedure for suspensions of over 30 days in municipalities of more than 500,000 population. The Superintendent can suspend officers for up to 30 days without resort to this section's procedures. Also, Police General Order 67–21 and various amendments establish some procedures for suspensions of less than 30 days.

8. This places the burden of setting the rate on the private sector bargaining process.

ployees of the Library. He did not see any need to discuss with the Mayor what a grievance procedure was and the Mayor never asked what a grievance procedure was. This discussion with the Mayor arose because a strike had been called against the Chicago Public Library.[9]

The Library is controlled by an independent Library Board. See Ill.Rev.Stat. ch. 81, §§ 117(2), (3) and (9) (1974). However, this does not place the Library in the same position as the Board of Education, nor is it as independent, as its budget is controlled and determined by the City and the City exercises more control over its management. This is similar to the status of the Police Board.

■ In order to clarify the issue before the Court, it is necessary to understand what rights police officers have in regard to the conditions of their employment. It should first be noted that this case does not involve one's termination from a job or the right to have a job. It involves the conditions of one's job. Thus, this case is unlike, e. g., Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). It should also be noted that as public employees, police officers do not come under the protection of the National Labor Relations Act. See 29 U.S.C. § 152(2); Bateman v. South Carolina State Ports Authority, 298 F.Supp. 999, 1002 (D.S.C. 1969).

■ The First Amendment rights of association, assembly and free speech allow public employees to join unions. See *id.* at 1003; Atkins v. City of Charlotte, 296 F.Supp. 1068, 1075 (W.D. N.C.1969). An employee cannot be fired merely for joining a union. See AFSCME v. Woodward, 406 F.2d 137 (8th Cir. 1969); Atkins v. City of Charlotte, 296 F.Supp. 1068 (W.D.N.C. 1969); see also Classroom Teachers Ass'n v. Board of Education, 15 Ill.App.

3d 224, 304 N.E.2d 516 (1973); Local 858 of AF of T v. School Dist. No. 1, Denver, Colorado, 314 F.Supp. 1069 (D. Colo.1970). Public employees do not have a full panoply of rights, however. They have no constitutional right to strike and may be subject to anti-strike provisions. See, e. g., Bennett v. Gravelle, 451 F.2d 1011 (4th Cir. 1971); Board of Education of Community Unit School District v. Redding, 32 Ill.2d 567, 207 N.E.2d 427 (1965); but see County of Peoria v. Benedict, 47 Ill.2d 166, 265 N.E.2d 141 (1970); City of Pana v. Crowe, 13 Ill.App.3d 90, 299 N.E.2d 770 (1973). Certain other rights may be curtailed due to one's status as a public employee. See, e. g., Crabinger v. Conlisk, 320 F.Supp. 1213 (N.D.Ill.1970), aff'd, 455 F.2d 490 (7th Cir. 1972); COP v. Conlisk, 489 F.2d 891 (7th Cir. 1973), cert. denied, 416 U.S. 956, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); cf. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

■ The question here is whether police have a constitutional right to a grievance procedure or to make collective bargaining mandatory. As a matter of Constitutional law, this Court agrees with the other courts which have held that no such right exists. See Lontine v. Van Cleave, 483 F.2d 966, 968 (10th Cir. 1973); Newport News Fire Fighters Ass'n Local 794 v. City of Newport News, 339 F.Supp. 13, 17 (E.D.Va.1972); Atkins v. City of Charlotte, 296 F.Supp. 1068, 1077 (W.D.N.C.1969); Cook County Police Ass'n v. City of Harvey, 8 Ill.App.3d 147, 289 N.E.2d 226 (1972). As was stated in *Atkins, supra* 296 F. Supp. at 1077:

"There is nothing in the United States Constitution which entitles one to have a contract with another who does not want it. It is but a step further to hold that the state may law-

---

9. It is common knowledge that when major strikes are called in Chicago, the "good offices" of the Mayor are often used in attempting to resolve the dispute. Mayor Daley acts unofficially as a labor mediator in these instances.

fully forbid such contracts with its instrumentalities. The solution, if there be one, from the viewpoint of the firemen, is that labor unions may someday persuade state government of the asserted value of collective bargaining agreements, but this is a political matter and does not yield to judicial solution."

■ While certain rights have been granted to public employees in Illinois,[10] the right to bargain collectively and have a grievance procedure is not among them. See, e. g., Cook County Police Ass'n v. City of Harvey, *supra*. Although such agreements can be entered into and are enforceable in Illinois,[11] there is no requirement that this be done. Although other states have granted these rights to police,[12] since neither Illinois nor the City of Chicago have done so, the Court will not impose these rights. *Cf.* American Fed. of Labor v. Watson, 327 U.S. 582, 598, 66 S.Ct. 761, 90 L.Ed. 873 (1946). The remedy, if any, lies with their legislative bodies, not the Court.

The plaintiff's remaining contentions concern allegedly discriminatory policies followed by defendants. The basic claim is that several of the defendants have made collective bargaining agreements with certain municipal employees, but not with the police, in violation of the Fourteenth Amendment's guarantee of equal protection. This claim fails for several reasons.

First, the evidence is not clear that the defendants have collectively bargained with other municipal employees. The Board of Education employees work for a corporate entity distinct from the City of Chicago and are not under the City's control. The craft union municipal employees are paid the prevailing private sector rate; however, the City does not enter into a collective bargaining agreement or take part in the private sector negotiations.

As to the Library workers, the only other group plaintiffs have mentioned, it is not clear whether the City and Mayor officially entered into the 1967 agreement, whether the Library Board as a corporate entity did so alone, or whether the Mayor unofficially entered the negotiations. The Court believes, however, that even if the City bargained with the Library workers, there has been no discrimination.

■ As no fundamental right is involved,[13] the issue is whether negotiating with the Library workers and not with police officers is rationally or reasonably related to a legitimate government purpose. See, e. g., San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

■ But the legislature is not required to cure all evils immediately. It can do so with a step-by-step process. See Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Beauboeuf v. Delgado College, 303 F.Supp. 861 (E.D.La.1969), aff'd per curiam, 428 F.2d 470 (5th Cir. 1970). It can agree to allow bargaining with some entities and not others. Id.

■ Also, there is a difference between police officers and library workers.

The requirements of the Police Department are extremely broad. Primarily

---

10. Public employees are included in the workman's compensation program. See Ill.Rev. Stat. ch. 48, § 138.1(a)(1). The public entity may check off union dues. See Ill.Rev. Stat. ch. 85, §§ 471, 472. This has been agreed to by the City for policemen. There is some uncertainty as to whether public employees may come within the Department of Labor's grievance procedure system. See Ill.Rev.Stat. ch. 10, § 20; Peckler v. Cullerton, 92 Ill.App.2d 290, 236 N.E.2d 289, 292 (1968).

11. See Classroom Teachers Ass'n v. Board of Education, 15 Ill.App.3d 224, 304 N.E.2d 516, 518–519 (1973).

12. See, e. g., N. Y. Civil Service Law, Art. 14, §§ 200, 204 (McKinney's Consol.Laws, c. 7, 1973); see also Comment, The Civil Service-Collective Bargaining Conflict in the Public Sector, Attempts at Reconciliation, 38 U.Chi.L.Rev. 826, 829–30 (1971).

13. See discussion of policemen's right to collective bargaining, *supra*.

there is a definite and extensive need for the viability of assignments of personnel, because the department operates 24 hours a day and is the sole law-enforcement agency responsible for policing the City of Chicago. There is a need and responsibility to be able to assign personnel based on crime conditions, time conditions, population areas, requests for service and other similar factors. The Police Department is a type of quasi-military organization because the department cannot afford the luxury of police officers operating as individual units, one officer as one unit. The department must operate as an entity, the officers making up the various organizational sub-units in that integrated structure. The department must be free to make a determination where it can move units at a given time, where it can assign units at a given time or location. There must be some type of internal discipline with strict controls over the activities of the officers. Police officers must be trained to obey orders instantly and immediately and it would be improper for police officers to begin questioning the orders of their superiors at the time they are issued. The nature of police work, being dangerous and important for the public's welfare, make rational, logical and necessary the decision of the defendants to treat the police differently from other types of employees. The implementation of a formal grievance procedure could tend to bog the entire system down as to the assignments, the validity of assignments, the response to emergency situations, and the assumption of the department's responsibility to the citizens of Chicago and maintaining an adequately staffed police force at all times. Police officers have been treated differently because of the nature of their jobs. See, *e. g.*, COP v. Conlisk, 489 F.2d 891 (7th Cir. 1973), cert. denied, 416 U.S. 956, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); Bullock v. Spencer, 112 F.Supp. 147 (D.D.C.1953); DeGrazio v. Civil Service Comm'n of Chicago, 31 Ill.2d 482, 202 N.E.2d 522 (1964); Nolting v. Civil Service Comm'n of Chicago, 7 Ill.App.2d 147, 129 N.E.2d 236, 243 (1955); *cf.* Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); but see Dwen v. Barry, 483 F.2d 1126 (2d Cir. 1973). Although other jurisdictions allow collective bargaining for police officers, and no evidence has been shown to indicate that this has adversely affected operations of their police forces, the decision on the far-reaching demands asserted here is one reserved to the legislature.

For the reasons stated, the amended complaint will be dismissed, each side to bear its own costs.

It is so ordered.